# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

THERESA BROOKS,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-567

Spiegel, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application for supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 14), the Commissioner's response in opposition (Doc. 15), and plaintiff's reply memorandum. (Doc. 18).

## I. Procedural Background

Plaintiff filed an application for SSI in February 2007, alleging disability since December 28, 2005, due to a heart attack, PTSD (post traumatic stress disorder), carpel tunnel syndrome, and hepatitis C. Plaintiff's application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a de novo hearing before administrative law judge (ALJ) Peter B. Silvain. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On March 23, 2010, the ALJ issued a decision denying plaintiff's SSI application. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Medical Evidence

### A. Physical Impairments

### 1. Treatment Records

Plaintiff was treated at Middletown Community Health Center between December 1999 and August 2006. (Tr. 260-88). Her complaints and diagnoses included residuals from a December 2005 myocardial infarction; carpal tunnel syndrome; hypertension; rectal bleeding; abdominal pain/diarrhea; dyspnea; chronic neck, back, and knee pain; insomnia; anxiety; depression; right trigeminal neuralgia[1]; and GERD (gastroesophageal reflux disease). (*Id.*). Plaintiff reported in April 2002 that she had been disabled since 1988. (Tr. 272).

On December 28, 2005, plaintiff was taken to the Middletown Regional Hospital emergency room in a private car by an individual who reportedly found her down on the side of the road. (Tr. 210-12). No other circumstances were known surrounding the event. Plaintiff was agitated and was unable to give a history. Plaintiff was diagnosed with cocaine intoxication, mixed drug abuse, acute respiratory failure, nonsustained ST elevation myocardial infarction, acute atrial fibrillation, acute aspiration pneumonia, bronchitis, hypothermia, hypotension, and hypertension. (Tr. 208). She was discharged on January 3, 2006, after she was stabilized and instructed to take Coreg, aspirin and Lisinopril; abstain from cocaine, other drugs, alcohol and smoking; and follow up with her primary care physician in two to four weeks. (Tr. 208-09).

Dr. Aleda Johnson, M.D., a family physician who treated plaintiff at the Middletown Community Health Center, completed a basic medical assessment form on February 8, 2006.

---

[1]Trigeminal neuralgia is a nerve disorder that causes a stabbing or electric-shock-like pain in parts of the face. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001751/.

(Tr. 265-66). Dr. Johnson described plaintiff's medical conditions as a 2005 myocardial infarction; hypertension and dyspnea since December 2005; anxiety disorder for 10 years; chronic neck and back pain since 1988; right trigeminal neuralgia since 2001; and carpal tunnel syndrome since the 1990's. (Tr. 265). She described plaintiff's health status as "deteriorating." (Tr. 265). Dr. Johnson opined that plaintiff could not stand/walk for more than five minutes in an eight-hour workday; she could not sit more than five to ten minutes in an eight-hour workday; she could lift/carry six to ten pounds frequently; and her ability to push/pull, bend, reach, and handle was moderately limited. Dr. Johnson concluded that plaintiff was unemployable and her limitations would last for 12 months or more. (Tr. 266).

Plaintiff underwent a colonoscopy in June 2007 for abdominal pain, diarrhea and a gastrointestinal bleed, and she was diagnosed with internal hemorrhoids. (Tr. 329-31). Plaintiff underwent a liver biopsy in July 2007 due to a chronic hepatitis C infection. (Tr. 387-89). The final diagnosis was chronic hepatitis C with mild activity (grade 1) and mild fibrosis (stage 1). (Tr. 389). A second colonoscopy performed in January 2008 for indications of persistent abdominal pain, diarrhea, and a gastrointestinal bleed revealed a few very small scattered diverticulosis, mild proctitis, and internal hemorrhoids with an otherwise grossly normal examination to the terminal ileum. (Tr. 362-63). An esophagogastroduodenoscopy (EGD) and biopsy performed in August 2007 revealed Los Angeles Classification A esophagitis, hiatal hernia, gastritis, and gastric antral vascular ectasis. (Tr. 381-82). Plaintiff was instructed to follow up with the doctor who performed the procedure, Dr. Dennis Min, D.O., in two weeks. (Tr. 382).

Plaintiff presented to the Middletown Regional Hospital emergency room on October 3, 2007, complaining of a headache and neck and ear pain which she rated as 10/10. (Tr. 375-77). The attending physician reported: "The patient is extremely tearful, crying, and continues to vacillate between her present complaints and a 20-year-old history of problems beginning back in 1988. It is somewhat difficult to keep her focused on the present problems." (Tr. 375). Plaintiff appeared to have celphalgia and some facial neuralgia similar to previous episodes. (Tr. 376). She was prescribed medication and encouraged to use an ice pack and heating pad, and she was to follow up with her family physician for possible referral to a neurologist. (*Id.*).

Plaintiff treated with Dr. Madhu Kosaraju, M.D., a primary care physician, from April 2007 to December 2009. (Tr. 539-82, 641-50). Plaintiff initially presented with wrist pain, and the other medical issues noted on the initial visit were coronary heart disease but no complaints of chest pain; essential hypertension, with only fair compliance with treatment; and GERD with moderate epigastric pain. (Tr. 577-78). Plaintiff complained of back pain beginning in August 2007. (Tr. 573). She described the pain as constant, moderate in intensity and sharp, with lifting and twisting as aggravating factors. She reported that muscle relaxants and narcotic pain medication provided some relief. She reported the pain became severe after she lifted something over the weekend, and she stated that she was previously followed at a pain clinic. (*Id.*). Plaintiff also reported in August 2007 that she had been diagnosed with generalized anxiety disorder and her symptoms included apprehension, shortness of breath, and tachycardia, which occurred several times a day. (*Id.*). On physical examination, plaintiff had a normal respiratory rate and pattern with no distress and decreased breath sounds throughout, her neck was supple with full range of motion, and she had a normal gait with lower back pain and paraspinal muscle spasms. (Tr. 573).

4

Dr. Kosaraju noted plaintiff's complaints of back pain, observed she had a normal gait, and assessed plaintiff with low back pain on the subsequent office visits:

- 9/18/07-Tr. 569-70
- 9/24/07-Tr. 567-68
- 10/4/07-Tr. 565-66
- 11/5/07- Tr. 561-64
- 3/10/08-Tr. 563-64
- 9/23/08-Tr. 554-55
- 11/21/08-Tr. 549-50
- 1/23/09-Tr. 543-44
- 2/18/09-Tr. 541-42
- 4/29/09-Tr. 539-40
- 7/29/09-Tr. 649-50
- 10/28/09-Tr. 645-46
- 1/12/09-Tr. 545-46
- 12/21/09-Tr. 641-42

Dr. Kosaraju's records reflect that he also treated or followed plaintiff for an ear ache, headache, generalized anxiety disorder, essential hypertension, emphysematous lung, coronary artery disease of a native coronary artery, wrist pain, GERD, incontinence, and cigarette smoking. (Tr. 542, 546, 550, 562, 578, 580). Dr. Kosaraju advised that plaintiff seek psychiatric treatment for her generalized anxiety disorder on October 21, 2008. (Tr. 552-53). On December 22, 2008, he noted that plaintiff was pleased with the relief she was obtaining from Klonopin. (Tr. 547). Dr. Kosaraju also noted plaintiff's history of noncompliance with medical treatment on several occasions. (Tr. 552, 554, 555, 580).

On June 15, 2007, Geraldine Thomas, APRN-BC, at the Ernst J. Bever Community Health Center wrote a prescription for a quad cane and a commode safety rest for plaintiff based on a diagnosis of left knee pain. (Tr. 583).

Plaintiff treated with Dr. Richard Gaeke, M.D., a gastroenterologist, for abdominal pain from April to June 2008. (Tr. 402-15). At her initial visit, plaintiff reported experiencing right-sided stabbing abdominal pain that was aggravated by meals; nausea; joint pain in her back; and

poor sleep, energy level, and appetite. (Tr. 414). Plaintiff denied shortness of breath but was

noted to actually be very short of breath. (*Id.*). On May 8, 2008, Dr. Gaeke diagnosed plaintiff

with probable IBS (irritable bowel syndrome) with severe psychiatric overlay and depression, and

he opined that she was possibly drug-seeking. He opined that plaintiff may need more aggressive

psychiatric intervention, although he expressed doubt it would be available or that plaintiff would

comply, and he opined that she be would be "very high risk for opiate [treatment]." (Tr. 411)

(emphasis in original). Dr. Gaeke noted on June 24, 2008, that he found no obvious internal

source for her right side abdominal, right hip, and low back pain; he diagnosed her with a history

of drug abuse, overdose, and major depression; and he diagnosed her with a history of hepatitis C

but noted that interferon treatment was contraindicated by her psychiatric history. (Tr. 403). Dr.

Gaeke opined that plaintiff's pain might be musculoskeletal or radicular as she reported it was

worsened by standing or ambulating and a Medrol Dospak was ineffective. Dr. Gaeke stated that

he would refer her to an orthopedist but he told her he would not prescribe controlled drugs.

(*Id.*).

Dr. L. Joseph Rubino, M.D., the orthopedist to whom plaintiff was referred, examined her

on July 8, 2008. (Tr. 417-18). On physical examination, she was alert and cooperative. She

walked with what appeared to be an antalgic gait, although it was difficult to ascertain as it

seemed to be related to her right-side pain. She had a negative seated and supine leg raise. There

was no pain with motion of the knee or with rotation, flexion or extension of the hip[2]. She had

pain to palpation over the entire thoracic spine, with even gentle palpation causing her "to squirm

in the chair" and to have severe pain. (Tr. 417). She described the pain as radiating down the

right lower extremity to the knee, and occasionally down the left side to the knee as well as into

---

[2]Dr. Rubino did not specify whether this finding applied to the right, left, or both knees and hips.

the anterior abdominal musculature underneath the ribs and underneath the right breast area. Dr. Rubino discussed with plaintiff x-rays of the pelvis, hip and low back taken that day (Tr. 419), which he reported were normal and showed no bony abnormalities. (Tr. 417). Dr. Rubino did not suspect any musculoskeletal issues, and his impression was lower thoracic, low back, flank and right hip pain of unknown etiology. (Tr. 418). Dr. Rubino decided to refer plaintiff for an MRI of the low back. Dr. Rubino noted that plaintiff requested narcotics and got upset and started crying when he told her he would not be able to give them to her. (Id.). However, he explained that the plan was to attempt to have her treated by the appropriate surgical specialty if any surgical indications were encountered, and she appeared to be agreeable to this plan prior to leaving the office. (Id.).

Plaintiff returned for follow-up of an MRI of the lumbar spine on August 26, 2008. (Tr. 416). Dr. Rubino reported that plaintiff's primary complaint was right flank pain which radiated anteriorly towards the abdomen. On physical examination, plaintiff was alert and cooperative. She walked with what appeared to be a slight antalgic gait. She had negative seated and supine straight leg raise. She had full range of motion of both hips and slight pain with maximal internal rotation. Dr. Rubino reported that the MRI results showed "multiple mild central disk herniations most significant at L4-5 and L5-SI and very minimal to no core compression." (Tr. 416). He assessed chronic low back pain. The plan was for plaintiff to pursue nonoperative treatment, to be referred to a neurologist and a pain specialist, and to return to her primary care physician for repeat evaluation related to stress incontinence and right-sided flank pain that was possibly related to a previous UTI (urinary tract infection). Dr. Rubino found no follow-up appointments with him were necessary and he discharged plaintiff from his care. (Id.).

In September 2008, plaintiff presented to the emergency room for lower back pain that had been present since the prior day, reporting she could not straighten up after picking up sticks and twigs in the yard for "an extended period of time" after a storm. (Tr. 468). She further reported that she had suffered chronic back pain since 1988, and "has only occasional pain associated with flare-ups with activity." (*Id.*). Straight leg raising was negative. (Tr. 469). There was no evidence of motor or sensory deficits. (*Id.*). It was noted that her MRI showed L4-L5 disc bulge with posterior annular tear and some posterior mild central canal stenosis with mild bilateral foraminal narrowing at those levels. (*Id.*). She was given pain medication, which gave her relief. (*Id.*). It was recommended that she follow up with her primary care physician, Dr. Kosaraju, in one to two days. (*Id.*).

In December 2008, plaintiff underwent a left heart catheterization, coronary angiography, left ventriculography, and central venous line access in the right femoral vein after experiencing recurrent symptoms of chest discomfort and an abnormal stress test. (Tr. 448-49, 458-60). The catheterization revealed angiographically patent coronary arteries and normal LV (left ventricular) size and systolic function. (Tr. 449).

Plaintiff presented to the emergency room in March 2009, complaining of increasing lower back pain over the last week and some bladder incontinence. (Tr. 423-24). Plaintiff reported she had fallen down the stairs earlier in the week. She was taking Vicodin for the pain. She had equal grip strength bilaterally. Straight leg raising was negative. She was uncomfortable lying down and when she walked, but it was noted she walked with a steady gait. She had diffuse lumbar tenderness. The pain was treated, and on reevaluation she was able to get up and walk around. A lumbar spine MRI showed moderate bilateral facet osteoarthropathy at

8

the L4-L5 level and mild bilateral facet osteoarthrosis at the L3-L4 and L5-S1 levels but no evidence of central spinal stenosis, disc herniation or other significant acquired lumbar disc pathology. (Tr. 425). Plaintiff was diagnosed with intractable back pain. (Tr. 424). She was discharged home, given Percocet and Flexeril, and instructed to follow up with her doctor. (*Id.*).

In December 2009, plaintiff presented to the emergency room with back pain and a right hand laceration sustained during a twisting fall. (Tr. 608-15). Examination showed pain with palpation over the entire lower back and SI joints radiating down her right leg. The attending physician noted that initially plaintiff admitted she always had pain consistent with his findings and was concerned regarding her hand, but she changed her history and claimed she had never had this particular pain before when she was advised she would not be prescribed pain medication in addition to her current prescriptions of 90 Vicodin ES, 90 Klonopin, and 90 soma each month. The attending physician noted that plaintiff's history "tended to become more involved and dramatic, and her leg pain and disability became much more severe each time she was advised that we would not prescribe additional pain medication for her." (Tr. 615). The physician stated that the fall may have exacerbated plaintiff's chronic pain, but it was difficult to tell if this was the case given her changing history and her "dramatic presentation." (*Id.*). It was noted that plaintiff denied experiencing any relief after being given Toradol and Norflex and then again after being administered 5 mg Valium. (*Id.*). Plaintiff was advised to follow up with her family doctor for further consultation regarding analgesia. (*Id.*). The final impression was lumbar pain, acute on chronic, and sciatic radiation. (*Id.*).

### 2. Consultive examinations

Consultative physician Dr. Martin Fritzhand, M.D., examined plaintiff at the request of the state agency and prepared a report dated April 11, 2007. (Tr. 314-20). Plaintiff's chief complaint was difficulty breathing. (Tr. 314). Plaintiff reported she could not walk more than one-half block without associated shortness of breath, and she complained of episodes of chest pain occurring once a month. Plaintiff reported she had smoked two packs of cigarettes a day until December 2005 and was currently smoking one pack a day. (*Id.*). On physical examination, plaintiff was comfortable in both the sitting and supine positions and breath sounds were clear. (Tr. 315). There was no clinical evidence of congestive heart failure. Dr. Fritzhand reported that plaintiff's peripheral vascular status was "excellent." (*Id.*). She had some discomfort localized to her hands. Plaintiff's right hand grasp strength was somewhat diminished and she had a positive Tinel's sign on the left. Range of motion studies were good. There were no joint abnormalities as heat, swelling and capsule thickening were absent. There was no evidence of nerve root damage as all sensory modalities were intact, and there was no evidence of muscle atrophy.

Dr. Fritzhand diagnosed exogenous obesity, history of recent heart attack, dyspnea secondary to tobacco abuse, and history of bilateral carpal tunnel syndrome. Dr. Fritzhand noted that based on the findings of his examination, he was "unable to assess a functional impairment without a resting EKG and pulmonary function studies," but he opined that if the studies would be noncontributory, then plaintiff would be capable of performing a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects. (*Id.*). Dr. Fritzhand also opined that plaintiff had "no difficulty reaching, but would have some

difficulty grasping with the right hand." (*Id.*). He further opined that she would do best in a dust-free environment. Dr. Fritzhand found that plaintiff had a long history of mental illness and he would not be surprised if daily activities and interests would be restricted by her mental status. (*Id.*).

Plaintiff was examined by Dr. Phillip Swedberg, M.D., at the request of the state agency on October 2, 2007. (Tr. 343-50). Plaintiff's chief complaint was low back pain, which she claimed had precluded her from working for the last 20 years. (Tr. 345). She denied shortness of breath or chest pain. (*Id.*). Plaintiff had a highly elevated blood pressure of 192/98 and she weighed 230 pounds. (Tr. 343). Dr. Swedberg diagnosed exogenous obesity, chronic low back pain without radicular symptoms, and poorly controlled hypertension. (Tr. 345). He reported that plaintiff's physical examination was "entirely normal." (*Id.*). He found that plaintiff ambulated with a normal gait and could forward bend without difficulty; range of motion of all extremities was completely normal; he did not suspect radiculopathy as there was no focal muscle atrophy and sensory modalities and deep tendon reflexes were intact; there was no evidence of muscle weakness; and there were no joint abnormalities. Dr. Swedberg opined that plaintiff was capable of performing at least a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects and she had no difficulty reaching, grasping, and handling objects. (*Id.*).

## C. State agency physician RFC assessments

State agency physician Dr. Willa Caldwell, M.D., reviewed the file on April 26, 2007, and completed a physical RFC assessment. (Tr. 321-28). Dr. Caldwell found that plaintiff could lift/carry and push/pull up to 50 pounds occasionally and 25 pounds frequently; sit about six

11

hours in an eight-hour workday; and stand/walk about six hours in an eight-hour workday. She could not climb ladders/ropes/scaffolds. She could frequently finger with her right hand. State agency physician Dr. Edmond Gardner, M.D., affirmed Dr. Caldwell's opinion as written on October 30, 2007, finding that the severe limitations underlying the opinion that plaintiff is unemployable were not supported by objective evidence; although the most recent exam showed poorly controlled hypertension and obesity, plaintiff denied chronic pain or shortness of breath at the consultative examination and was not undergoing treatment for either; plaintiff complained of carpal tunnel syndrome but this was not documented at the current examination; and the overall clinical picture did not appear to be significantly changed. (Tr. 351).

### B. Mental Impairments

### 1. Treatment Records

A 1999 basic medical form from Middletown Community Health Center described plaintiff's mental conditions as anxiety disorder and cocaine abuse. (Tr. 276-77). It listed her medications as Paxil and described her condition as poor but stable.

Plaintiff presented to Sycamore Hospital in May 2003 with a two-week history of redness and swelling in her left arm due to injection of cocaine. (Tr. 174-207). Plaintiff reported she had been using cocaine intermittently since her 20's and daily since the preceding December. (Tr. 175). Plaintiff was initially placed in a regular bed, but she had a visitor who the nursing staff suspected had provided plaintiff with illicit drugs. Plaintiff was then prohibited from having visitors. When plaintiff consulted with Dr. Teller, an addiction specialist, she expressed some suicidal ideation, so she was transferred to the intensive care unit where psychiatrist Dr. Vinod Patwa, M.D., evaluated her. (Tr. 180). Dr. Patwa reported that plaintiff was alert and oriented to

place, person, and time. Her speech was coherent. Thinking was evasive, peripheral, and vague. She exhibited massive denial. She was heavily into projection externalization. Her mood was irritated, but she denied any depression or associated symptoms of depression as well as any suicidal ideation, intent, or plan. Her affect was labile. Dr. Patwa found plaintiff to be manipulative, very demanding, and "constantly blaming others." (*Id.*). She was argumentative and defensive. Plaintiff was offered inpatient treatment, outpatient treatment, a substance abuse program, and a dual diagnosis program, but she was not interested in any of those recommendations. After the interview by Dr. Patwa, plaintiff put on her clothes and left the ICU. She was found nearby by police, detained, and brought back to the hospital. (Tr. 175). She was subsequently discharged under the care of her boyfriend. (*Id.*). Her discharge diagnoses included left forearm cellulitis/abscess, cocaine dependency, polysubstance abuse, suicidal ideation, chest pain, and nicotine dependency. (Tr. 174).

On April 4, 2008, plaintiff was admitted to Atrium Medical Center after she was found essentially unresponsive on the floor with drug paraphernalia. (Tr. 521). A toxicology screen was positive for barbiturates, benzodiazepines and cocaine. (Tr. 522). Plaintiff gave a history of an individual who had died in a motor vehicle accident recently, who was later learned to be her niece. (Tr. 507). Plaintiff continually sought medication at the hospital, primarily narcotics. (*Id.*). After she was medically stabilized in the intensive care unit, plaintiff was transferred to the psychiatric ward. (Tr. 519). Visitors brought her cigarettes upon her transfer to the ward, and it was suspected they may have brought in drugs in addition to cigarettes so further visitors were banned. (Tr. 507). Plaintiff regained her ability to relate to those around her and remained oriented to time, person, and place and was therefore transferred to the open unit, which she

13

managed without difficulty. (*Id.*). Plaintiff's discharge diagnoses from the psychiatric ward included mood disorder, not otherwise specified; substance abuse; episodic personality disorder, not otherwise specified; chronic obstructive pulmonary disease; and essential hypertension. (Tr. 507).

### 2. Consultive examination

Consultative psychologist Dr. Jayne Malpede, Ph.D., evaluated plaintiff at the request of the state agency and prepared a report dated March 20, 2007. (Tr. 289-94). Plaintiff reported that she was not receiving mental health treatment at the time of the evaluation due to a lack of insurance, but she continued to experience severe anxiety and depression. (Tr. 290). Plaintiff reported that she had stopped using heroin but admitted to having used cocaine three days before the examination. (*Id.*). Dr. Malpede observed that plaintiff walked without assistance and had a normal gait. She was anxious and fidgety during the clinical interview and appeared to have difficulty focusing. Her grooming and hygiene were poor and she smelled of smoke. She needed to be redirected several times during the evaluation and her attention and concentration were poor. (Tr. 291). Plaintiff's speech was rapid in pace, velocity, and rate, her flow of conversation was mostly logical but was tangential at times and she was easily distracted, she had poor eye contact, and her affect was labile. (*Id.*). Plaintiff became tearful on several occasions when discussing her fears and she reported difficulty concentrating and feeling hopeless, worthless, and lethargic. (Tr. 291). Plaintiff remembered only two of three objects after fifteen minutes, she was unable to complete a serial 7's exercise, she repeated only six digits forward and four digits backward in an inconsistent manner on a digit span measure, and her memory for recent and remote events was variable. Dr. Malpede observed overt signs of anxiety during the interview.

14

Dr. Malpede opined that plaintiff's judgment was likely impaired by her continued use of street drugs, particularly cocaine. (Tr. 292).

Plaintiff reported she was able to perform her activities of daily living with some assistance from her boyfriend, although if she was having a bad day she would stay in bed all day and forget to shower or dress. (Tr. 293). Plaintiff reported she did not drive or socialize with others outside of her family and did not properly care for her health because of a fear of doctor's appointments. (*Id.*). Dr. Malpede diagnosed plaintiff with panic disorder with agoraphobia; major depressive disorder, recurrent, moderate; cocaine dependence; and personality disorder, NOS, with cluster B traits. (Tr. 294). She assigned a GAF score of 50.[3] (*Id.*).

Dr. Malpede opined that plaintiff was moderately impaired in her ability to relate to others, including co-workers and supervisors, and in her ability to maintain concentration, persistence, and pace in the performance of routine tasks. (Tr. 293). Dr. Malpede found that plaintiff had the mental ability to understand and follow directions but there did appear to be some impairment in concentration and she was easily distractible because of anxiety symptoms. (*Id.*). Dr. Malpede found that plaintiff's mental ability to withstand stress and pressure associated with day-to-day work activity was markedly impaired by plaintiff's "anxiety and depressive symptoms, as well as her continued use of cocaine." (Tr. 293). Dr. Malpede opined that these symptoms "are likely to preclude work-related activities, however, they may respond to

---

[3]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms.

comprehensive mental health and substance abuse treatment." (*Id.*). Dr. Malpede concluded that plaintiff "demonstrates the mental ability to manage her funds but not the mental work-related capacity for job tasks at this time. Anxiety and depressive symptoms should respond to comprehensive mental health treatment. Additionally, she will likely require residential substance abuse treatment at this time to treat her cocaine dependence." (*Id.*).

### 3. State agency physician RFC assessments

State agency medical consultant Dr. Leslie Rudy, Ph.D., reviewed the record and completed a Mental RFC Assessment and a Psychiatric Review Technique form on April 3, 2007. (Tr. 296-313). She opined that plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 310). She further determined that the evidence did not establish the presence of the "C" criteria. (Tr. 311). Dr. Rudy opined that plaintiff's statements are inconsistent and are not considered to be credible. (Tr. 298). She concluded that plaintiff retained the capacity to perform simple, repetitive tasks in a predictable environment where she does not have to closely relate to others. (*Id.*).

Dr. Aracelis Rivera, Psy.D., reviewed the evidence of file and affirmed the assessment of Dr. Rudy as written on July 30, 2007. (Tr. 342). She opined that the medical evidence of record did not support plaintiff's allegation on reconsideration that she has been so depressed since approximately January 5, 2007, that she does not want to get out of bed.

16

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a) (4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson* v. *Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir.

2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The claimant has not engaged in substantial gainful activity since February 13, 2007, the application date (20 CFR 416.971 *et seq.*).
>
> 2. The claimant has the following severe impairments: 1) residuals of a myocardial infarction; 2) carpal tunnel syndrome; 3) emphysema; 4) multiple mild lumbar central disc herniations, most significant at L4/L5 and L5/S1; 5) obesity; and 6) post traumatic stress disorder (PTSD) (20 CFR 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 416.967(b) featuring: 1) lifting up to 20 pounds occasionally but lifting or carrying up to 10 pounds frequently; 2) standing or walking for approximately 6 hours and/or sitting for up to 6 hours of an 8-hour work day with normal breaks; 3) no more than frequent pushing or pulling on the right side; 4) no climbing of ladders, ropes, or scaffolds; 5) frequent balancing, but no more than occasional climbing of ramps or stairs, stooping, kneeling, crouching, or crawling; 6) no more than frequent fingering on the right side; 7) avoidance of moderate exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas; 8) ready access to a bathroom; 9) simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements; 10) only simple work related decisions with few, if any, work place changes; and 11) only occasional interaction with the public.
>
> 5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born [in] 1959 and was 47 years old and defined as a younger individual on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age on her attainment of age 50 (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. As the claimant has no past relevant work, she also possesses no transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 13, 2007, the date the application was filed (20 CFR 416.920(g)).

(Tr. 14-21).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*,

478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

(1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ failed to properly weigh the medical opinion evidence by summarily dismissing the opinion of Dr. Johnson, a treating physician, without analyzing it fully, and by failing to give proper consideration to Dr. Malpede's conclusion that plaintiff's ability to tolerate the stress of daily work is markedly impaired[4]; (2) the ALJ failed to follow the proper procedure for analyzing the effects of plaintiff's substance abuse on her disability; and (3) the ALJ failed to properly consider the objective findings contained in the progress notes of Drs. Gaeke and Rubino.

---

[4]Plaintiff specifically alleges that the ALJ erroneously took her history of substance abuse into account when determining the weight to accord Dr. Malpede's opinion. Because this alleged error is closely related to plaintiff's second assignment of error, the Court will consider plaintiff's argument that the ALJ failed to give proper weight to Dr. Malpede's opinion in conjunction with plaintiff's second assignment of error.

**1. The ALJ did not err by failing to properly weigh the medical opinion evidence of record.**

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a non-examining medical advisor. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 416.927(c)(2); *see also Blakley*, 581 F.3d at 406; *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from

21

reports of individual examinations, such as consultative examinations or brief hospitalizations."
20 C.F.R. § 416.927(c)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ
must consider a number of factors when deciding what weight to give the treating source's
opinion. 20 C.F.R. § 416.927(c). These factors include the length, nature and extent of the
treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(c)(2)(i)(ii);
*Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source,
how well-supported by evidence the opinion is, how consistent the opinion is with the record as a
whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §
416.927(c)(3)-(6); *Wilson*, 378 F.3d at 544.

Dr. Johnson, a treating family physician, opined in February 2006 that plaintiff was
limited to standing/walking for no more than five minutes in an eight-hour workday and to sitting
for no more than five minutes in an eight-hour workday, among other limitations. (Tr. 266).
Plaintiff contends that the ALJ failed to follow the requisite analysis with respect to Dr.
Johnson's opinion because the ALJ's discussion of her opinion was limited to the following
statement: "In terms of supportability and consistency with the overall record, this physician [Dr.
Johnson] achieves low marks. . . ." (Doc. 14 at 13, citing Tr. 20). Plaintiff contends that the ALJ
should have accorded greater weight to Dr. Johnson's opinion because Dr. Johnson is a treating
source who was familiar with plaintiff's medical record and longitudinal history, and her
professional opinion about plaintiff's functional limitations is supported by progress notes dating
back to December 1999. (Doc. 14 at 14, citing Tr. 261-81). In terms of medical specialty,
plaintiff points out that as a family physician, Dr. Johnson has a more holistic understanding of

plaintiff's physical and psychological impairments and the interplay between them than any other physician of record. Also, plaintiff asserts that Dr. Johnson's diagnoses and opinions about the limitations resulting from plaintiff's impairments are supported by the evidence (*Id.*, citing Tr. 314, 343, 345, 402, 403, 412, 414, 416-17, 419, 430, 461, 463, 468, 539-41, 545, 573, 610, 615), including an August 2008 MRI that revealed disc bulges at L4-L5 and L5-SI and Dr. Rubino's examination, which revealed tenderness over plaintiff's entire thoracic spine. (*Id.*, citing Tr. 417, 425). Plaintiff further contends that other records document chronic shortness of breath, depression and anxiety and additional impairments that are consistent with the level of limitation Dr. Johnson's opinion describes. (*Id.*, citing Tr. 173-182, 261, 264, 270, 275-76, 285-86, 355, 362, 379, 387-88, 402, 443, 445, 498-99, 575, 577-78). Finally, plaintiff argues that the reviewing and examining physicians whose opinions conflicted to some extent with that of Dr. Johnson did not have the opportunity to review the complete record and their opinions are therefore entitled to minimal weight. (*Id.*).

In response, the Commissioner asserts that plaintiff apparently sought treatment at the Middletown Community Health Center only a few times between 1999 and February 2006, and Dr. Johnson's name appears in the clinic records only a few times (Doc. 15 at 6, citing Tr. 261-86); the evidence plaintiff cites shows the presence of back pain and anxiety, which the ALJ found to be severe impairments, but does not support a finding that these impairments were of disabling severity (*Id.* at 7); and Dr. Johnson herself never cited to nor was privy to much of this evidence since most, if not all, of it was generated by doctors at other facilities *after* Dr. Johnson rendered her opinion in February 2006. (*Id.*).

Plaintiff's contention that the ALJ summarily dismissed Dr. Johnson's opinion without explaining his reasons for doing so is unfounded. As the regulations require, the ALJ explained that he was not giving controlling weight to Dr. Johnson's February 2006 decision that plaintiff could not stand, sit or walk for more than five minutes in an eight-hour workday and was unemployable for 12 or more months due to neck and back pain, dyspnea, and a diagnosis of trigeminal neuralgia made in 2001. (Tr. 19-20). The ALJ stated that he instead decided to give "little weight" to Dr. Johnson's opinion. (Tr. 20). Contrary to plaintiff's argument, the ALJ set forth specific reasons for his decision to accord less than controlling weight to Dr. Johnson's opinion: he described the opinion as "rather cursory;" he found that it was not supported by detailed medical findings; he noted that Dr. Johnson acknowledged there were no focal neurological deficits and plaintiff's lungs were clear; and he determined that Dr. Johnson's conclusions were not reflected elsewhere in the record by any treating, examining or reviewing medical source. (Tr. 20). The ALJ concluded the opinion was entitled to "little weight" in view of the lack of "supportability and consistency with the overall record." (Tr. 20). These are "good reasons" for the ALJ to decide to accord "little weight" to Dr. Johnson's opinion. (*See* 20 C.F.R. § 416.927(c): "(3) Supportability: The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Moreover, the ALJ's reasons for according "little weight" to Dr. Johnson's opinion are substantially supported by the record. Dr. Johnson did not cite relevant evidence or provide an

24

explanation for her opinion as specifically required by the form she completed. (Tr. 266, Section G.5). Nor is there any indication that she reviewed Middletown Health Center records before rendering her opinion. Furthermore, Dr. Johnson rendered her opinion in February 2006, one year prior to plaintiff's February 2007 application, and she says nothing about plaintiff's functioning *after* her date of application. Nor did Dr. Johnson have the opportunity to review or consider any of the record evidence post-February 2006, or examine plaintiff to determine her actual functioning after that date.

For these reasons, plaintiff has not shown that the ALJ erred by declining to give Dr. Johnson's opinion controlling weight and deciding to accord it "little weight." Plaintiff's first assignment of error should be overruled.

### 2. The ALJ erred by failing to properly analyze the effects of plaintiff's substance abuse on the question of disability.

Plaintiff argues that the ALJ failed to follow the proper procedure for analyzing the effects of her history of substance abuse on her disability. Plaintiff contends that the ALJ erroneously considered the effects of her substance abuse while making his initial determination as to whether she is disabled and in assessing her credibility. Plaintiff argues that the ALJ erred because he was required to first determine her RFC based on the five-step sequential evaluation process without separating out any effects of her substance abuse; determine whether such an RFC results in disability; and then consider whether plaintiff's substance abuse imposes additional limitations that affect her ability to work. Plaintiff further argues that because the ALJ did not find her substance abuse to be a severe impairment, it was improper for the ALJ to consider her drug use to be material to a finding of disability. (Doc. 14 at 15-16). Plaintiff contends if her substance abuse is not material to a finding of disability, then it was improper for

the ALJ to discredit her testimony or the medical evidence, including Dr. Malpede's assessment that she was markedly impaired in her ability to handle stress, based on her drug use. (*Id.* at 16-17).

The Social Security Act provides that "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §1382c(a)(3)(J). The implementing regulations specify the sequential evaluation process the ALJ must follow when the issue of substance abuse presents itself. This process requires the ALJ to *first* determine whether a claimant suffers from a disability before proceeding–if necessary–to a determination of whether the substance abuse is a "contributing factor material to the determination of disability." 20 C.F.R. § 416.935.[5]

_____

[5]Title 20 C.F.R. § 416.935 sets forth the process for determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability:

(a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability, unless we find that you are eligible for benefits because of your age or blindness.

(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.

(1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that

In this case, the ALJ improperly conflated the sequential analysis by considering plaintiff's substance abuse issues prior to making a determination of disability. In fact, the ALJ's decision fails to even mention the controlling regulation, 20 C.F.R. § 416.935. *See Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003) ("[T]he ALJ's failure to cite [operative regulation on substance abuse] anywhere in his decision was not a mere drafting oversight, but accurately reflected his failure to follow the procedures prescribed there. The Commissioner has duly promulgated regulations in this area, which the ALJ may not silently disregard."). In an analogous case within the Sixth Circuit, one district court explained the rationale for reversing and remanding based upon a similar error:

> To find that drug addiction is a contributing factor material to the determination of disability without first finding the claimant disabled, as the ALJ did here, is to put the cart before the horse. . . . The implementing regulations make clear that a finding of disability is a condition precedent to an application of § 423(d)(2)(C).[6]

*Williams v. Barnhart*, 338 F. Supp.2d 849, 862 (M.D. Tenn. 2004) (finding legal error where the ALJ improperly considered claimant's cocaine addiction as detracting from the credibility of her complaints of seizure activity and other symptoms). *See also Brueggemann*, 348 F.3d at 693-95; *Drapeau v. Massanari*, 255 F.3d 1211, 1214-15 (10th Cir. 2001). As the Eighth Circuit in *Brueggemann* explained in analyzing cases involving drug or alcohol abuse:

> The ALJ must base this disability determination on substantial evidence of [the claimant's] medical limitations without deductions for the assumed effects of substance use disorders. The inquiry here concerns strictly symptoms, not causes, and the rules for how to weigh evidence of symptoms remain well established.

your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

[6]Section 423(d)(2)(C) is the analogous provision under the Disability Insurance Benefits provision of the Social Security Act relating to whether drug or alcohol abuse is a contributing factor material to the determination of disability.

Substance use disorders are simply not among the evidentiary factors our precedents and the regulations identify as probative when an ALJ evaluates a physician's expert opinion in the initial determination of the claimant's disability. . . .

If the gross total of a claimant's limitations, *including* the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent.

348 F.3d at 694-95 (emphasis added). In other words:

Only after the ALJ has made an initial determination 1) that [the claimant] is disabled, 2) that drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what limitations would remain in the absence of alcoholism or drug addiction, may he then reach a conclusion on whether [the claimant's] substance use disorders are a contributing factor material to the determination of disability. If this process proves indeterminate, an award of benefits must follow. The alternative procedure adopted by the ALJ in this case remains inconsistent with the regulations binding on claimants, the ALJs, and this court. The ALJ's decision reflects legal error.

*Id.* at 695.

The ALJ in the instant case erred in his evaluation of plaintiff's substance abuse issues in contravention of the Social Security regulations. First, the ALJ never determined whether plaintiff's substance abuse was a severe or nonsevere impairment or continued to be an ongoing problem. (Tr. 15-16). His decision states that plaintiff "has a well-established history of polysubstance abuse, although *she claimed* at the hearing she is now abstinent. The claimant's mental problems, whatever the diagnosis is, could be expected to limit her to simple, routine types of work with no stringent production requirements and limited personal contacts." (Tr. 15) (emphasis added). The ALJ never made a finding that he credited plaintiff's current claim of abstinence from drugs, or whether plaintiff ceased her substance abuse as of a specific date, if any, and emergency room records show abuse continuing through at least April of 2008. (Tr.

28

522). The Court is simply unable to discern from the ALJ's opinion whether he accepted plaintiff's claim that she was no longer abusing drugs, as it appears he avoided the issue by concluding that in any event she could still do a range of simple, repetitive work.

Second, the ALJ also improperly evaluated plaintiff's substance abuse disorder in connection with Step Three of the sequential evaluation process–whether plaintiff has impairments which meet or equal a Listing. (Tr. 17). In connection with his Listing's analysis, the ALJ noted that Dr. Malpede assessed that plaintiff was markedly impaired in her ability to cope with stress. However, the ALJ improperly discounted this portion of Dr. Malpede's assessment because the ALJ stated that plaintiff was still abusing cocaine when she was evaluated by Dr. Malpede. (Tr. 17, citing Tr. 289-94). The ALJ also noted that Dr. Malpede believed plaintiff was only moderately limited in maintaining concentration, persistence and pace. (Tr. 17). The ALJ then expressed doubt as to whether substance abuse was material to a finding of disability in plaintiff's case by noting: "The potential argument that the claimant could not have been dependable in maintaining concentration or a work schedule while she was still involved in illegal drug use is less than evident or persuasive. . . . *Discounting the effects of her substance abuse*, the claimant would be considered to have no more than moderate impairment in this area of functioning [the ability to maintain concentration or a work schedule], and she would seem capable of doing simple kinds of work tasks with little production pressure." (Tr. 17) (emphasis added). Then, after improperly considering plaintiff's substance abuse issues in assessing Dr. Malpede's opinion at Step Three, the ALJ accounted for plaintiff's mental limitations by restricting her to simple, routine and repetitive tasks in a work environment free of fast-paced production requirements, among other limitations. (Tr. 18). The ALJ erred by

29

deducting the assumed effects of plaintiff's substance abuse in his initial disability determination, when he should have considered whether plaintiff was disabled in the first instance, based on all of the evidence of record including the symptoms arising from plaintiff's substance abuse. 20 C.F.R. § 416.935; *Brueggemann*, 348 F.3d at 694-95. The ALJ's decision in this regard constitutes legal error and must be reversed.

Moreover, the ALJ's decision highlights the analytical problems when an adjudicator considers substance and alcohol abuse in connection with the five-step sequential evaluation process, instead of following the controlling regulation. In this case, the Court recognizes that Dr. Malpede's assessment that plaintiff was markedly impaired in her ability to handle stress and pressure was not unqualified. Dr. Malpede opined that plaintiff's "mental ability to withstand the stress and pressure (emphasis in original) associated with day-today [sic] work activity is markedly impaired by the claimant's anxiety and depressive symptoms, as well as her continued use of cocaine. (emphasis added). These symptoms are likely to preclude work-related activities, however, they may respond to comprehensive mental health and substance abuse treatment." (Tr. 293). Dr. Malpede concluded that although plaintiff did not demonstrate the "mental work-related capacity for job tasks" at that time, "[a]nxiety and depressive symptoms should respond to comprehensive mental health treatment." (*Id.*). Dr. Malpede further opined that plaintiff would likely require residential substance abuse treatment to treat her cocaine dependence. (*Id.*). Based on Dr. Malpede's assessment that plaintiff's mental functioning was adversely impacted by her abuse of cocaine but should respond positively to mental health treatment, the ALJ concluded that plaintiff's mental impairments were not disabling if her substance abuse was discounted. (Tr. 17). However, the ALJ's decision fails to account for the

30

degree to which plaintiff's anxiety and depressive symptoms–apart from her cocaine dependence– affected her ability to work. The Court is unable to discern from the instant record the degree to which plaintiff's inability to handle the stress and pressure of daily work activity is adversely affected by her anxiety and depressive symptoms, as opposed to any continuation of substance abuse. Coupled with the ALJ's failure to specify whether he accepted plaintiff's representations that she was no longer abusing drugs, the Court cannot conclude that any legal error committed by the ALJ was harmless. For these reasons, plaintiff's second assignment of error should be sustained.

### 3. The ALJ did not err by failing to properly consider the objective findings of Drs. Gaeke and Rubino.

Plaintiff alleges as her third assignment of error that the ALJ erred by failing to discuss in sufficient detail the objective findings contained in the progress notes of Dr. Gaeke (Tr. 402-15) and Dr. Rubino (Tr. 416-19) and to consider these physicians' objective findings when determining the RFC. (Doc. 14 at 18). Plaintiff contends that the error was not harmless because the objective findings provide further support for the medical opinion of her treating physician, Dr. Johnson. (*Id.* at 18). Plaintiff specifically alleges that the ALJ failed to consider Dr. Rubino's report that she had "pain to palpation over the entire thoracic spine" (*Id.*, citing Tr. 403, 407-412, 414); Dr. Gaeke's report that during his numerous interactions with plaintiff, she consistently reported lower back pain and "abdominal pain which felt like knives inside" (*Id.*, citing Tr. 416-18)[7]; Dr. Gaeke's examination findings of mild to moderate tenderness of the right

---

[7]Plaintiff has apparently confused the notes and findings of Dr. Rubino and Dr. Gaeke in presenting her arguments, as Dr. Gaeke's records are located at Tr. 402-415 and Dr. Rubino's records are located at Tr. 416-418.

upper quadrant of the abdomen and voluntary guarding of her abdomen (Doc. 18 at 5, citing Tr. 403, 408, 411); and imaging studies of chronically enlarged bile ducts. (*Id.*). Plaintiff contends that the ALJ thereby violated his obligation to issue a written decision that sets forth the findings of fact and reasons for the decision.

The ALJ is obligated to consider the record as a whole. *See Hurst v. Secretary of Health and Human Services,* 753 F.2d 517, 519 (6th Cir. 1985). It is essential for meaningful appellate review that the ALJ articulate reasons for crediting or rejecting particular sources of evidence. *Morris v. Secretary of Health & Human Services,* No. 86-5875, 1988 WL 34109, at *2 (6th Cir. April 18, 1988). Otherwise, the reviewing court is unable to discern "if significant probative evidence was not credited or simply ignored." *Id.* (citing *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir. 1981)). The ALJ need not provide a "written evaluation of every piece of testimony and evidence submitted. However, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Id.* (citing *Zblewski v. Schweiker,* 642 F.2d 75, 79 (7th Cir. 1984); *Hurst,* 753 F.2d at 519).

Here, the ALJ undertook a thorough review and analysis of the medical evidence and opinions of record. (Tr. 14-20). The ALJ acknowledged findings by both Dr. Rubino (Tr. 14) and Dr. Gaeke (Tr. 16). The ALJ noted that Dr. Rubino interpreted the August 2008 MRI he requested following his initial examination of plaintiff as revealing evidence of mild central disc herniations, most significant at L4/L5 and L5/SI, with very mild to no core compression. (Tr. 14). The ALJ referenced Dr. Gaeke's findings of mild hepatitis and mild fibrosis of the liver. (Tr. 16). Plaintiff has not shown that either Dr. Rubino or Dr. Gaeke made additional objective

32

findings that are probative of the disability determination that the ALJ ignored. Both Dr. Rubino and Dr. Gaeko reported tenderness and plaintiff's complaints of pain, but neither physician offered an opinion as to the functional limitations, if any, imposed by plaintiff's tenderness and pain. Moreover, plaintiff has not shown how her subjective complaints of pain lend further support to Dr. Johnson's opinion of her functional limitations, which was formulated more than two years before Dr. Gaeke and Dr. Rubino rendered their assessments. The ALJ therefore did not err by failing to consider plaintiff's subjective complaints as reported to Drs. Rubino and Gaeke when formulating the RFC. Plaintiff's third assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Date: 9/11/2012

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

THERESA BROOKS,
      Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant

Case No. 1:11-cv-567
Spiegel, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).